## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KAREN L. RIDGEWAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-158-LPS-CJB |
| | ) |
| BAYHEALTH MEDICAL CENTER, | ) |
| INC., a Delaware corporation, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Karen L. Ridgeway ("Ridgeway" or "Plaintiff") filed this action against

defendant Bayhealth Medical Center, Inc. ("Bayhealth" or "Defendant"), alleging a single claim

of employment discrimination based on age, in violation of the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* Presently pending before the

Court is Defendant's Motion for Summary Judgment ("Motion"). (D.I. 32) For the reasons set

forth below, the Court recommends that the Motion be GRANTED.

### I.   BACKGROUND

#### A.   Factual Background

##### 1.   Plaintiff's Employment History

Plaintiff began her employment at Bayhealth, a Delaware healthcare system, in 1981.

(D.I. 1 at ¶ 10) Bayhealth, which is comprised of Kent General and Milford Memorial Hospitals,

employs its "Five Star Standards" as a way of setting out how its employees should interact with

others, including patient "customers." (D.I. 33 at 2; D.I. 34 at 47-48)[1] These "Five Star

---

[1]     Citations to D.I. 34, an appendix provided by Defendant, will be to the ECF page
numbers associated with the document.

Standards" state that, *inter alia*, employees are expected to provide the "'highest quality of service'" and "'meet[] customers' needs with utmost care and courtesy[.]'" (D.I. 33 at 2-3; D.I. 34 at 48)

Plaintiff served as a registered nurse for the entirety of her employment with Bayhealth; in the last ten years of her work there, she worked on a medical surgical unit, and assisted patients with their daily activities and treatment. (D.I. 34 at 4) Defendant ultimately terminated Plaintiff's employment in December 2010, when Plaintiff was 52 years old. (D.I. 1 at ¶ 12; D.I. 34 at 10) Plaintiff's supervisor for most of her last ten years at Bayhealth was Kathleen Boyer. (D.I. 34 at 62)

From 2000 to 2008, Plaintiff (with one exception) received a rating of "above expectations" in her annual performance evaluations, which, for the most part, included very positive comments regarding Plaintiff's interaction with peers and fellow patients. (D.I. 34 at 85; D.I. 37 at B1-B15) However, from 1988 through 2009, Plaintiff was also cited for 13 different disciplinary violations, including six verbal warnings, four written violations and three suspensions. (D.I. 34 at 86) Many of these violations related to Plaintiff's demeanor with staff and patients, such as violations for being "[r]ude to staff[,]" and "[r]ude and unsympathetic toward patient and family[,]" making "derogatory comments in [the] presence of . . . staff" and for "[r]ude and offensive behavior[.]" (*Id.*) One such incident occurred in 2006, when Plaintiff was given a verbal warning after she told a fellow employee in the Pharmacy department who could not understand her instructions: "'Let me speak to someone who can speak [E]nglish.'" (*Id.* at 50)

For the 2009 year, Plaintiff received a rating of "meets expectations" (D.I. 37 at B16-

B17)  While this report included positive comments, it also noted, *inter alia*, that Plaintiff had "little patience for those co-workers who do not share her work ethic[,]" was described as "intimidating" by newer nurses and as someone who can "come across as hostile" when she or her patients are not getting what they need.  (*Id.* at B17)

In September 2010, Plaintiff was involved in a few incidents at Bayhealth.  On September 5, 2010, a technician in the Telemetry Department twice notified Plaintiff about a particular patient's slow heart rate.  (D.I. 34 at 52)  According to a later-filed Employee Corrective Action Record, Plaintiff responded with "indifference to this news" and was said to have not effectively communicated to the technician that her assessment of the patient was different than what was being reported on the patient's heart monitor.  (*Id.* at 52, 65)

On September 8, 2010, Plaintiff was involved in two separate patient-related incidents. In the first, a patient named J.Y. refused to let Plaintiff care for her any further, asserting that Plaintiff "treated me like I was lazy."  (*Id.* at 52)  J.Y claimed that Plaintiff had addressed her in an "insulting" manner that lacked "compassion" and was "rude."  (*Id.* (quotation marks omitted)) For her part, Plaintiff explained that the patient liked to stay in bed a lot, and that Plaintiff had to "strongly encourage her" to get up and walk around so as to avoid blood clots.  (*Id.* at 8; D.I. 37 at B21)  Plaintiff also stated that J.Y. lied about many aspects of their interaction.  (D.I. 34 at 8, 10)

In the second September 8 incident, Plaintiff told Boyer that she had "had enough" with a wheelchair-bound patient named R.H. and could not assist him anymore.  (*Id.* at 52)  When Boyer checked on the patient, she found him crying and anxious; he said that he did not want Plaintiff taking care of him any further, as unlike the other nurses who were "wonderful and very

compassionate[,]" Plaintiff was instead "focused on 'attacking him'" and denying him access to a wheelchair. (*Id.*) R.H.'s wife was also in tears when she spoke with Boyer, and asserted that Plaintiff was "keeping [R.H.] like a prisoner[.]" (*Id.*) For her part, Plaintiff claimed that the dispute arose over R.H.'s attempts to leave the hospital floor to smoke; when Plaintiff tried to stop what she saw as behavior dangerous to R.H.'s health, she said R.H. became almost "violent" and this "scared" her. (*Id.* at 9-10, 53; D.I. 37 at B20) Plaintiff stated that she spoke in the "kindest manner" to R.H. whenever they interacted, and denied that she had attacked him verbally. (D.I. 37 at B20)

Plaintiff was suspended for five days due to these September 2010 incidents. (D.I. 34 at 52) An Employee Corrective Action Record regarding the incidents states that "[b]eginning immediately, [Plaintiff] will begin to demonstrate compassion and caring for her patients and their well being by improving her communication style[,]" and that the behaviors Plaintiff displayed were "not acceptable" and required "immediate and sustained improvement." (*Id.* at 53) It noted that any "additional policy infractions will result in an immediate termination." (*Id.*)

In significant part due to these September 2010 incidents, Plaintiff received a "below expectations" rating on her 2010 annual performance evaluation, which she signed on December 23, 2010. (*Id.* at 39-50) The incidents were referenced in the evaluation as examples of Plaintiff's failure to effectively communicate with others, or to demonstrate compassion and caring to patients. (*Id.*) Ultimately, although it noted some positive aspects of Plaintiff's work, the evaluation concluded that Plaintiff had "struggled" with creating and supporting Bayhealth's "Five-Star Service culture." (*Id.* at 48) At the end of the evaluation, Boyer writes that while Plaintiff did not completely agree with the assessment, she "verbalized understanding of areas of

4

needed improvement." (*Id.* at 50)

Two days later, on December 25, 2010, a patient, M.J., expressed that she was upset and dissatisfied with Plaintiff. (*Id.* at 55, 57) The patient stated that she had a migraine headache, but that Plaintiff did not show her "compassionate behavior[,]" delayed providing medication for the migraine and failed to follow up with her. (*Id.* at 55-56) The patient described this as a "'horrible experience.'" (*Id.* at 56) Plaintiff, for her part, asserted that she had treated the patient with compassion and had attempted to accelerate the process of getting the patient her medication. (D.I. 37 at B25-B27)

Following this December 25, 2010 incident, Bayhealth decided to terminate Plaintiff's employment. (D.I. 34 at 55) An Employee Corrective Action Record regarding the termination cites this incident as part of a "pattern of insensitive, inappropriate, and uncaring behavior" allegedly displayed by Plaintiff during her tenure. (*Id.* at 56) A January 2011 letter sent to Plaintiff regarding the termination (the "January 2011 termination letter"): (1) noted that Plaintiff was discharged for cause, due to failing "to deliver care in a manner consistent with organizational standards"; (2) cited Plaintiff's "insensitiv[ity] to patient needs and [a lack of] compassion necessary to promote an effective patient/staff relationship"; and (3) noted this was part of a "pattern of similar behavior" Plaintiff had displayed in the past. (*Id.* at 59) Plaintiff appealed the discharge internally; Bayhealth's Chief Executive Officer thereafter denied the appeal, noting in a February 2011 letter (the "February 2011 letter") that Plaintiff's description of certain of these incidents differed from the patients' description, but finding the patients' complaints to be "credible[.]" (*Id.* at 60)

5

## 2. Information Regarding Other Bayhealth Nurses

In her briefing, Plaintiff has pointed to three nurses at Bayhealth who were younger than Plaintiff and whom Plaintiff asserts are appropriate comparators.

The first, referred to in the briefing as "Nurse A," was 23 years old at the time of Plaintiff's termination in December 2010, and had been working for Bayhealth as a nurse for one year and two months at that time. (D.I. 37 at B45) In or around January 2010, a patient in Nurse A's care began to vomit, and the patient's granddaughter stated that when she asked Nurse A for help, Nurse A responded "'What would you like me to do?'" and failed to help in any way. (*Id.* at B42) In reviewing the incident, Boyer wrote that Nurse A was a "brand new nurse[,] fresh off orientation" about whom Boyer had been receiving "very positive feedback[.]" (*Id.* at B41) Boyer stated that Nurse A had attempted to call for a doctor when she saw the patient vomiting. (*Id.*) However, Boyer wrote that Nurse A had "not communicat[ed] effectively with" the patient's granddaughter in failing to inform her that Nurse A was attempting to call a doctor, which left the impression that Nurse A did not care about the patient. (*Id.*)

In June 2010, Nurse A was involved in another incident, in which a patient complained about Nurse A's attitude. (*Id.* at B35) Boyer later wrote that Nurse A was upset about the condition of the patient's roommate and may have "come across" the wrong way to the patient. (*Id.*) Since this was the second time Nurse A had a patient express concern over her attitude and care, Boyer treated the incident as worthy of a "formal coaching session" with the understanding that a future complaint would result in counseling. (*Id.*) She wrote that the incident was likely due to Nurse A's "inexperience and newness coming through[.]" (*Id.*)

Nurse B was 24 years old at the time of Plaintiff's termination; she had been working for

6

Bayhealth for four years at that time, and as a nurse for seven months. (*Id*. at B49)  In or around July 2010, in Nurse B's second month as a nurse, a patient complained that she had failed to timely respond to his request for help in using the bathroom. (*Id*. at B37)  Boyer later wrote that Nurse B had a different memory of the nature of the request, but that she acknowledged having failed to pass along the patient's request during a shift-to-shift report. (*Id*.)

Nurse C was 29 years old at the time of Plaintiff's termination; she had been working for Bayhealth for over eight years at that time, and as a nurse for over seven years. (*Id*. at B44-B45)  In January 2010, Nurse C was involved in an incident in which a patient's daughter complained that she had not been kept apprised of her mother's condition. (*Id.* at B40)  According to the patient, when she called and spoke to Nurse C (who was acting as Charge Nurse) about the situation, Nurse C "'yelled at her'" and said that it was not the nursing staff's responsibility to notify the patient's daughter. (*Id.*)  Boyer later wrote that Nurse C admitted that she "may have been coming across as stern" in her conversation with the patient's daughter, but that Nurse C claimed that the woman was yelling and would not listen to Nurse C's explanation about the incident. (*Id.*)  There is no record of Nurse C being disciplined regarding this incident. (*Id*. at B53)

### B.    Procedural History

On February 10, 2012, Plaintiff filed her Complaint. (D.I. 1)  On April 6, 2012, this matter was referred to me by Judge Leonard P. Stark to "hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions[.]" (D.I. 9)

On January 14, 2013, Defendant filed the instant Motion. (D.I. 32)  Defendant's Motion was fully briefed as of February 25, 2013. (D.I. 38)

7

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party has demonstrated the absence of a genuine dispute of material fact, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.*

8

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter

the outcome are "material," and a factual dispute is genuine only where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively,

is—genuinely disputed must support the assertion either by citing to "particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials"; or by "showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.  DISCUSSION

### A.  *McDonnell Douglas* Burden-shifting Analysis

The ADEA makes it "unlawful for an employer . . . to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. §

623(a). In the absence of direct evidence of discrimination, a plaintiff may prove age

discrimination through the familiar burden-shifting analysis developed by the United States

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Smith v. City of*

*Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *Bowman v. U.S. Dept. of Agric.*, Civ. No. 10-

00493-LPS, 2013 WL 1291622, at *2 (D. Del. Mar. 28, 2013). The parties agree that the

*McDonnell Douglas* burden-shifting framework is applicable to Plaintiff's claim of disparate

9

treatment, as Plaintiff does not point to the existence of direct evidence of discrimination here. (D.I. 33 at 12-13; D.I. 36 at 13)

Under *McDonnell Douglas*, a plaintiff must first successfully establish a *prima facie* case of age discrimination. *Smith*, 589 F.3d at 689; *Bowman*, 2013 WL 1291622, at \*2. If she does so, then the burden of production shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Smith*, 589 F.3d at 690; *Bowman*, 2013 WL 1291622, at \*2. If the defendant employer can provide such a reason, the burden shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that the reasons offered by defendant were not its true reasons for the adverse employment action, but were instead a pretext for age discrimination. *Smith*, 589 F.3d at 690; *Bowman*, 2013 WL 1291622, at \*2.[2]

## B. Analysis

### 1. *Prima Facie* Case

To establish a *prima facie* case of age discrimination, a plaintiff must show: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she is qualified for the position; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Bowman*, 2013 WL

---

[2]     The Third Circuit has endorsed the continued use of the *McDonnell Douglas* framework even after the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009), which required that a plaintiff seeking to recover under a disparate treatment age discrimination theory must prove by a preponderance of the evidence that age was the "but for" cause of the challenged employment action. *Smith*, 589 F.3d at 691; *Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 551 n.7 (D. Del. 2012). The Third Circuit has explained that *Gross* stands for the proposition that it is improper to shift the burden of persuasion (including the burden of proving "but for" causation) to the defendant in an age discrimination case; it has noted, however, that *McDonnell Douglas* does not do this, and instead shifts only the burden of production between the plaintiff and employer at each of its three stages. *Smith*, 589 F.3d at 691; *Ashley*, 869 F. Supp. 2d at 551 n.7.

10

1291622, at *2; *Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 551 (D. Del. 2012).

While the above-stated form of *prima facie* case is ordinarily applicable to ADEA claims, rigid

adherence to a specific form of *prima facie* proof has been eschewed by the Supreme Court and

by the United States Court of Appeals for the Third Circuit. *Ashley*, 869 F. Supp. 2d at 551

(citing cases). Accordingly, "'the precise elements of a plaintiff's prima facie case may vary with

the particular circumstances' of a case." *Id.* at 552 (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d

491, 494 (3d Cir. 1995)).

For purposes of the present motion, the parties do not dispute that Plaintiff can establish

the first three elements of the *prima facie* case, in that Plaintiff is over 40 years old, was qualified

for her position, and was terminated. Defendant contests, however, that Plaintiff has sufficiently

established the fourth element. (D.I. 33 at 14-16; D.I. 38 at 2-5)

As to that element, here there is no suggestion in the record that Plaintiff was replaced by

a younger employee. In such a circumstance, our Court has explained:

> [A] more generic fourth element is appropriate. Specifically, a showing
> that the circumstances of the adverse employment action gives rise to an
> inference of age discrimination would be sufficient to satisfy the fourth
> element of a prima facie case. . . . A common circumstance[] giving rise to
> an inference of unlawful discrimination . . . [is] the more favorable
> treatment of similarly situated colleagues outside of the relevant class. . . .
> Ultimately, plaintiff's evidentiary burden at [the *prima facie*] stage is rather
> modest: it is to demonstrate to the court that the plaintiff's factual scenario
> is compatible with discriminatory intent—i.e., that discrimination could be
> a reason for the employer's action.

*Ashley*, 869 F. Supp. 2d at 552 (internal quotation marks and citations omitted); *see also Johnson*

*v. St. Luke's Hosp.*, Civil Action No. 06-3417, 2007 WL 3119845, at *5 (E.D. Pa. Oct. 23, 2007);

*Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). Here, Plaintiff

11

asserts that she has established the fourth element of her *prima facie* case because "persons outside her protected classification were treated more favorably[.]" (D.I. 36 at 14) More specifically, she asserts that "Nurses A, B, and C did not suffer any formal discipline in response to patient complaints, while Plaintiff was suspended and then terminated for patient complaints lodged against her in the last four months of 2010." (*Id.*)

The Third Circuit has explained that "similarly situated" employees need not be "identically situated" in order to be considered valid comparators, but that they must nevertheless be similar in "all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (internal quotation marks and citation omitted); *see also Haskins v. Christiana Care Health Servs.*, 701 F. Supp. 2d 623, 629 (D. Del. 2010). While the factors relevant to this analysis depend on the context of each case, often a showing that a person is similarly situated "includes [evidence that] the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 F. App'x at 223 (internal quotation marks and citations omitted); *see also Haskins*, 701 F. Supp. 2d at 629.

In assessing whether Plaintiff can demonstrate that Nurse A, B or C is an appropriate comparator, the decision in *Haskins v. Christiana Care Health Servs.*, 701 F. Supp. 2d 623 (D. Del. 2010) is instructive. In *Haskins*, the plaintiff, an African-American patient guide in the maternity ward at the defendant's hospital, alleged that she was wrongfully terminated on the basis of her race. *Haskins*, 701 F. Supp. 2d at 624-25, 628. From July 2003, when she started her work as a patient guide, through March 2004, the plaintiff accumulated seven violations of

12

defendant's lateness policy and a number of third-party complaints from visitors and patients who had expressed dissatisfaction with her rude demeanor toward them. *Id.* at 625. Eventually, the plaintiff was placed on "Decision Making Leave" (or "DML") due to these infractions—the final level of discipline prior to termination under the terms of defendant's disciplinary policy. *Id.* at 625-26. Thereafter, plaintiff received two additional complaints regarding plaintiff's professional demeanor and various additional violations for lateness; these additional infractions resulted in plaintiff being placed on two different "Action Plan[s.]" *Id.* at 626. Each time she was placed on such a plan, plaintiff was told that any future discipline could result in termination of her employment. *Id.* In November 2006, after plaintiff was one minute late to work, she was found in violation of the Action Plans and was terminated. *Id.*[3]

In reviewing plaintiff's claim, the *Haskins* Court determined that plaintiff could not make out a *prima facie* case of racial discrimination, in part because she had not identified any similarly situated employees who were treated more favorably than her. *Id.* at 628. Plaintiff had pointed to two other non-African American patient guides as potential comparators, whom plaintiff claimed had been guilty of multiple infractions of the lateness policy, but were never disciplined as a result. *Id.* The *Haskins* Court found, however, that the employment characteristics of the potential comparators were "sufficiently dissimilar" from that of plaintiff, as the potential comparators did not possess "a similarly lengthy disciplinary record in comparison to [plaintiff]." *Id.* at 629-30. It noted that neither proposed comparator had been

---

[3]        The plaintiff's termination came despite the fact that she had received generally positive employment evaluations during this period, indicating that she was performing at a satisfactory to above-average level, and despite the fact that she had received positive feedback from certain patients and visitors. *Haskins*, 701 F. Supp. 2d at 626.

placed on DML, whereas plaintiff had been placed on that status and then received two separate action plans due to her "serial violations" of the lateness policy. *Id.* at 630. The *Haskins* Court explained that plaintiff had also not "cit[ed] to any evidence in the record to demonstrate that either [proposed comparator] had a comparable number of lateness or other disciplinary infractions" and that this was particularly relevant "in light of the fact that once [plaintiff] was placed on DML and/or an Action Plan, she was subject to termination for a single infraction under the Disciplinary Policy." *Id.; see also Maull v. Div. of State Police, Dept. Of Pub. Safety, State of Del.*, 141 F. Supp. 2d 463, 479 (D. Del. 2001) (finding that circumstances of each proposed comparator were not sufficiently similar to plaintiff's circumstances, where none of the comparators had disciplinary records similar in length or scope to plaintiff's disciplinary record, and none were on probation at the time of their misconduct, as was plaintiff), *aff'd* 39 F. App'x 769 (3d Cir. 2002).

In this case, as in *Haskins*, even if the identified conduct of the proposed comparators is deemed similar to that triggering Plaintiff's dismissal, the prior disciplinary records of those comparators is significantly different from Plaintiff's history. Indeed, it is so different, in so many different ways, that a reasonable jury could not conclude that Nurse A, B or C were similarly situated to Plaintiff.

For example, here the record does not indicate that any of the proposed comparators were the subject of a long history of complaints about rude behavior; in contrast, Plaintiff's disciplinary record consisted of fourteen violations—not including the December 2010 incident that resulted in her termination—many of which involved allegations of rude behavior directed to

14

patients or staff members.[4] Although some of the complaints regarding Plaintiff's alleged rude behavior were lodged long ago, others were made in closer proximity to Plaintiff's termination, beginning with the 2006 complaint by Plaintiff's co-worker in the Pharmacy Department. (D.I. 34 at 50-51) Indeed, even just focusing on 2010—the final year of Plaintiff's employment with Defendant—staff and patients complained about Plaintiff's rude or unprofessional behavior regarding at least *four* separate incidents (i.e., the September 5 incident involving the Telemetry Department; the two separate incidents on September 8 involving J.Y. and R.H.; and the December 25 incident involving M.J.).[5] These incidents occurred in a short four-month span—essentially coming one right after the other.

In contrast, Nurse A was the subject of just two patient complaints (coming about six months apart) while Nurse A was in her first year of employment as Bayhealth nurse, and Nurses B and C were each involved in a *single* incident in which patient or patient's family member complained about their conduct. (D.I. 37 at B35-B42) The glaring difference in the scope of Plaintiff's and her proposed comparators' disciplinary records is alone sufficient for the Court to

---

[4]     (*See, e.g.*, D.I. 34 at 86 (October 3, 1998 verbal warning for: "Rude to staff"; July 14, 1989 written violation for, *inter alia*: "Negative behaviors"; November 28, 1989 suspension for: "Insensitive remarks auditory to patients"; January 4, 1990 written violation for: "Rude and unsympathetic toward patient and family"; May 5, 2000 suspension for, *inter alia*: "derogatory comments in presence of [] staff"; November 20, 2006 verbal warning for: "Rude and offensive behavior"; and September 14, 2010 suspension for, *inter alia*: "Unprofessional conduct" and "Rude behavior"))

[5]     Plaintiff's December 2010 performance evaluation noted yet another encounter with a patient who was left with the impression that Plaintiff lacked compassion and did not care about her, after Plaintiff rejected the patient's request for a second lunch tray of her favorite meal. (D.I. 34 at 48; *see also id.* at 66-67) While it does not appear that Plaintiff was formally disciplined with respect to this incident, Boyer and the Director of Patient Care Services discussed the incident with Plaintiff, emphasizing that nursing is a service profession and patients needed to be served with care and compassion. (*Id.* at 48)

15

conclude that these other nurses cannot be deemed appropriate comparators. *See Kuzma v. MBNA Institutional PA Servs., LLC*, NO. 2:10cv1433, 2013 WL 808837, at *6-7 (W.D. Pa. Mar. 5, 2013) (stating that in order for a co-employee to be an appropriate comparator, he or she should "possess a similar disciplinary record" as the plaintiff, and finding proposed comparator's disciplinary record to be dissimilar, where plaintiff had "a history of documented incidents of inappropriate and unprofessional conduct" while proposed comparator, at most, had isolated incidents of less severe, unreported misconduct); *Briggs v. Pa. Dept. of Transp.*, No. 02: 07-cv-0118, 2009 WL 2475455, at *8 (W.D. Pa. Aug. 7, 2009) (where plaintiff had extensive disciplinary record, including nine suspensions, while purported comparators had received only counseling for their infractions and had no prior disciplinary action taken against them, plaintiff's record was "a differentiating circumstance which prevents any of the [purported comparators] from being deemed 'similarly situated' to [p]laintiff").

Additionally, another significant difference sets Plaintiff apart from the proposed comparators: she, like the plaintiff in *Haskins*, was on the final step of Defendant's progressive discipline policy at the time of her termination. (D.I. 34 at 15)[6] In conjunction with Plaintiff's five-day suspension in September 2010 (which resulted from the three separate preceding complaints of inappropriate behavior in that month), Defendant warned Plaintiff that "[a]ny additional policy infractions will result in an immediate termination." (D.I. 34 at 53; *see also id.* at 15) Just a few months later—and a mere two days after Plaintiff had received her

---

[6]      While the progressive disciplinary policy itself does not appear to be a part of the record before the Court, Plaintiff confirmed in her deposition testimony that such a policy existed and that she was on its final step (i.e., that she would be terminated if she engaged in similar incidents of behavior to those that had precipitated this step). (D.I. 34 at 15)

2010 "below expectations" performance evaluation, during which she verbalized her understanding of the need to improve her customer service skills—Plaintiff again faced a similar complaint. (*Id.* at 39-50, 55-57) This was the December 25 complaint from M.J. about Plaintiff's lack of compassionate care, which M.J. termed a "horrible experience." (*Id.* at 55-57)

In contrast, there is no evidence that Nurses A, B, or C were on the final step of Defendant's disciplinary policy (or were anywhere near such a stage) at the time in which they received complaints regarding their interpersonal communications. Thus, since Plaintiff (unlike those other nurses) was on the precipice of termination at the time of the infraction-at-issue, it stands to reason that her December 2010 violation resulted in an outcome dissimilar from any discipline that the other nurses faced. *See, e.g., Haskins*, 701 F. Supp. 2d at 630; *Coleman v. Blockbuster, Inc.*, Civil Action No. 05-4506, 2008 WL 2622912, at *10 n.10 (E.D. Pa. June 30, 2008) (plaintiff and co-worker were not similarly situated, even though they had committed identical policy violations, where proposed comparator had no disciplinary history at time of the violation, while plaintiff had already received two final warnings, such that the "difference between [plaintiff and the co-worker's] disciplinary histories explains the differing treatment of the two and shows that [employer] followed its own policies").

As set out above, Defendant assertedly made the decision to terminate Plaintiff based not on a single isolated incident, but because of a "pattern" of rude behavior that persisted in spite of discipline, counseling, and even a final warning. (*See, e.g.*, D.I. 34 at 85; D.I. 37 at B33) Yet since Nurses A, B and C had different and vastly dissimilar disciplinary histories than did Plaintiff, any disparate treatment they received for a similar infraction could not be said to give rise to an inference of discriminatory motive. Therefore, Plaintiff cannot rely on these

17

comparators to make out the fourth prong of her *prima facie* case. *See, e.g., Maull*, 39 F. App'x at 773-74 (affirming district court's finding that plaintiff's proffered comparators were not similarly situated, where plaintiff had attempted to make comparisons on an incident-to-incident basis, but the record reflected that defendant terminated plaintiff "based not only on the events of October 10-13, 1998, but also on his probationary status and his disciplinary record"); *see also Haskins*, 701 F. Supp. 2d at 630; *Kuzma*, 2013 WL 808837, at *7.[7]  As a result, the Court recommends that summary judgment be granted in favor of Defendant with respect to Plaintiff's claim. *See Ashley*, 869 F. Supp. 2d at 552 n.9 (noting that a plaintiff's "[f]ailure to make out a prima facie case will result in a judgment for the defendant") (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

### 2. Pretext

Even assuming that Plaintiff had met her burden as to her *prima facie* case, however, the grant of summary judgment would still be appropriate. It is not disputed that Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination (i.e., that Plaintiff's pattern of alleged insensitive, inappropriate and uncaring behavior toward co-workers and patients was the impetus for her discharge). (D.I. 33 at 16-17; D.I. 36 at 16)  Once an employer does so, the plaintiff then carries the burden of proving that this reason was a pretext for discrimination. *Bowman*, 2013 WL 1291622, at *3. In order to show pretext in discrimination

---

[7]     The Court's conclusion here is further reinforced by the fact that, in its briefing, Plaintiff makes no extended legal argument in support of the claim that Nurses A, B, or C are actually "similarly situated" to Plaintiff, and cites to no case law in support of that assertion. Rather, Plaintiff simply states her conclusion that "persons outside her protected classification were treated more favorably" because they "did not suffer any formal discipline in response to patient complaints." (D.I. 36 at 14; *see also id.* at 17)

cases, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *Bowman*, 2013 WL 1291622, at \*3. In this Circuit, this two-pronged test is known as the *Fuentes* test. *Ashley*, 869 F. Supp. 2d at 553.

Plaintiff makes four basic arguments with respect to pretext, all directed at prong one of *Fuentes*. That is, Plaintiff attempts to demonstrate that a reasonable jury, assessing this evidence, could find that Defendant's proffered legitimate, non-discriminatory reason "was not merely wrong, but . . . was 'so plainly wrong that it cannot have been the employer's real reason[,]'" *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)), and that instead age discrimination was the "but for" cause of her termination, (D.I. 36 at 15 & n.6). The Court disagrees, finding that each of these four arguments, either individually or taken together, are insufficient to support denial of the Motion.

First, Plaintiff argues that Defendant is "attempting . . . to bolster its proffered reasons for Plaintiff's termination by claiming that her termination had something to do with alleged negative interactions with co-workers." (*Id.* at 16) Plaintiff points to her January 2011 termination letter, and asserts that its contents make clear that the "proffered reason for [her] termination was solely her alleged deficient patient care." (*Id.*) Therefore, according to Plaintiff, when Defendant now relies on negative interaction with *co-workers* (like the September 5, 2010 incident with a technician in the Telemetry Department) to further bolster its reasons for

19

termination, this is an example of shifting explanations that suggest pretext. (*Id.*)

Plaintiff's argument is belied by the evidence of record. The January 2011 termination letter states that Plaintiff was terminated "for failure to deliver care in a manner consistent with organizational standards[.]" (D.I. 37 at B33) By way of further explanation, the letter notes that an investigation concluded that Plaintiff was "insensitive to patient needs and lacked compassion necessary to promote an effective patient/staff relationship," but that the decision was also informed by Plaintiff's prior "pattern of similar behavior during [her] employment with Bayhealth" such that it was "unlikely [Plaintiff's] behavior would improve[.]" (*Id.*) Similarly, the Employee Corrective Action Record referencing Defendant's decision to discharge Plaintiff states that "[d]uring [Plaintiff's] tenure at Bayhealth [she] ha[s] developed a pattern of insensitive, inappropriate, and uncaring behavior." (D.I. 34 at 56) It is clear from the record that prior complaints of Plaintiff's rudeness to co-workers were a part of the "pattern" of conduct that informed Plaintiff's 2011 termination. (D.I. 37 at B34 (January 2011 termination letter citing "pattern of insensitive behavior" during Plaintiff's tenure, evident in Plaintiff's "personnel record[,]" as supporting termination decision); *see also* D.I. 34 at 72-75 (Boyer citing evidence of prior interactions with peers as part of "pattern" of behavior informing Plaintiff's termination); *id.* at 85-86 (Defendant Memorandum citing Plaintiff's "record" as part of the basis for her termination, and thereafter listing Plaintiff's disciplinary record, including incidents with co-workers))

Second, Plaintiff argues that given the strong reviews she received for her patient care in the decade leading up to her termination, the assertion that Defendant terminated her for patient complaints made in the last four months of her employment is unworthy of belief. (D.I. 36 at 16)

20

It is well-settled, however, that "positive evaluations prior to [a plaintiff's] termination, standing alone, [are] not sufficient to support an inference of pretext." *Haskins*, 701 F. Supp. 2d at 632-33 (citing cases). Here, as in *Haskins*, the fact that Plaintiff had received positive feedback with respect to certain aspects of her employment in the past did not exempt her failure to comply with Defendant's "Five Star Standards." *Id.*

Additionally, here the nature of those prior positive evaluations are clearly juxtaposed with the decidedly less positive evaluations that Plaintiff received in 2009 ("meets expectations") and 2010 ("below expectations"). (D.I. 37 at B16-17; B28-B31); *see Jones v. United Parcel Service, Inc.*, No. 03-0284-CV-W-GAF, 2005 WL 1009572, at *19 (W.D. Mo. Apr. 7, 2005) ("While . . . positive performance evaluations [are] a powerful indicator of satisfactory performance, an employer is free to rely more heavily on recent performance than past performance."). Indeed, co-worker and patient complaints of Plaintiff's rude and insensitive behavior were the very reasons why Plaintiff's formerly positive performance evaluations grew more negative in the months and years leading up to her termination. (D.I. 37 at B17 (2009 evaluation citing fact that Plaintiff had "little patience for [] co-workers who do not share her work ethic[,]" needed to be "mindful of how her words and actions come across to her peers[,]" was "intimidating" and "comes across as hostile to other members of the healthcare team"); D.I. 34 at 39-51 (2010 evaluation setting out the various 2010 incidents and describing how they contributed to a "below expectations" rating)) Contrary to Plaintiff's argument, Plaintiff's evaluation history (and how it changed over time), *bolsters* Defendant's legitimate non-discriminatory reason for termination.

Third, Plaintiff argues that Defendant failed to take into account other information

regarding the September 2010 complaints from R.H. and J.Y. before deciding to terminate

Plaintiff—particularly a letter written by a third patient, asserting that these allegations were

false. (D.I. 36 at 8, 16-17; D.I. 37 at B23) As an initial matter, even if this letter could properly

be considered at this stage, (D.I. 38 at 8-9), there is little evidence in the record regarding it. In

terms of explaining how the letter is asserted to evidence pretext, Plaintiff cites only to a portion

of Boyer's deposition. (D.I. 36 at 8, 16-17) That portion of the deposition transcript, however,

indicates that Boyer could not recall at the time of the deposition whether or not she had seen the

letter, or had shared it with other members of Defendant's leadership team, prior to Plaintiff's

termination. (D.I. 34 at 72) This record does not clearly support Plaintiff's assertion that

Defendant had the letter in its possession and then "failed to take [it] into account" before firing

Plaintiff. (D.I. 36 at 16-17)[8] And more broadly, the record otherwise confirms that multiple

decision-makers were involved in the decision to terminate Plaintiff's employment, and that they

considered a compilation of evidence (including Plaintiff's own written and verbal statements,

the patient complaints, statements by Plaintiff's colleagues, and Plaintiff's personnel file) before

doing so. (D.I. 34 at 59-60)

It is well-established a court may not "second-guess a company's business judgment or

decisional process"; the inquiry here, instead, is whether the asserted rationale for termination is

so implausible that it is unworthy of credence. *See Garvin v. Progressive Cas. Ins. Co.*, No.

5:08-cv-3758, 2010 WL 1948593, at *7 (E.D. Pa. May 10, 2010) (rejecting plaintiff's argument

that decision maker's failure to review all of the documentation surrounding investigation prior

---

[8]     Indeed, the substance of Boyer's deposition testimony is the opposite: she
testified that if she had had the letter in her possession, she "would have" taken it into account in
deciding what discipline to impose on Plaintiff. (D.I. 34 at 72)

to terminating plaintiff established pretext); *see also Ashley*, 869 F. Supp. 2d at 555 ("[T]he

ADEA has not transformed courts into 'super-personnel department[s] that reexamine[] entities'

business decisions.'") (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d

Cir. 1995)). Here, the scant evidence of record regarding the letter at issue provides no firm basis

to question the plausibility of Defendant's rationale for termination.

Fourth and finally, Plaintiff also cites to the assertedly more favorable treatment of

Nurses A, B, and C as evidence of pretext. (D.I. 36 at 17)  However, as the Court has explained,

these co-workers were not similarly situated to Plaintiff, and are thus not proper comparators.

Accordingly, even if Plaintiff had established a *prima facie* case, which she did not, she

has failed to put forth sufficient evidence from which a reasonable jury could conclude that the

purported reasons for Defendant's decision to terminate Plaintiff were a pretext for intentional

age discrimination. On this basis also, Defendant is entitled to summary judgment with respect

to Plaintiff's claim.

## IV.   CONCLUSION

For the reasons set forth above, I recommend that Defendant's Motion for Summary

Judgment be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1) and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-

79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

23

The parties are directed to the Court's Standing Order in Non-Pro Se Matters For

Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is

available on the District Court's website, located at http://www.ded.uscourts.gov.


Dated:  September 30, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE